UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. JEFFREY RICHARDSON, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 5: 17-129-DCR |
| V. | ) ) | |
| LEXINGTON FOOT & ANKLE CENTER PSC, et al., | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Relators Jeffrey Richardson and Ramona Brooks filed this *qui tam* action under the False Claims Act against Defendants Michael Allen, DPM, Lexington Foot & Ankle Center, PSC, and Lexington Diabetic Center, PSC, on March 15, 2017. [Record No. 1] They allege that Allen and the defendant organizations took part in fraudulent schemes to gain reimbursement to which they were not entitled from federal health care programs. The United States filed a notice of its election not to intervene on February 9, 2018. [Record No. 13] The Court directed that the Complaint be unsealed and the relators were permitted to serve the defendants. The defendants then filed a motion to dismiss on April 23, 2018. [Record No. 15] Shortly thereafter, on May 8, 2018, the United States filed a motion to partially intervene. [Record No. 17]

For the reasons that follow, the defendants' motion to dismiss will be granted and the United States' motion to intervene will be denied, as moot.

# I.

Defendant Michael Allen is a podiatrist and the president/director of Defendant Lexington Foot & Ankle Center, PSC, which owns and operates eight podiatric clinics in various locations around Kentucky. [Record No. 1, ¶¶ 12, 14] Allen is also the president and director of Defendant Lexington Diabetic Center, PSC, which offers diabetic and primary medical care services in two locations in Kentucky. *Id.* at ¶ 13. Relators Richardson and Brooks are podiatrists who were previously employed by Allen and Lexington Foot & Ankle Center. *Id.* at ¶ 10-11. Richardson was employed from December 2012 to September 2016 and Brooks for a substantially shorter period (July 2016 to September 2016). *Id.*

The relators claim that, during their respective tenures, they became familiar with the defendants' fraudulent activities through a variety of avenues. *Id.* at ¶ 65. They allege that Allen oversaw the defendants' medical records and billing systems, and controlled and trained all of the billing and records staff. *Id.* at ¶ 85. According to the relators, the staff was trained to ensure that records contained key terms and findings to obtain payment from federal health care programs. *Id.* Allen and his staff instructed podiatrists to include "key terms" in their patient records and would even add such terms after-the-fact to justify billing. *Id.* at ¶ 87-88. To ensure that key terms and phrases were incorporated into patient records, Allen and the defendants utilized templates which included language likely to cause reimbursement. *Id.* at ¶ 89. Podiatrists were admonished when they resisted using the templates. *Id.* at ¶ at 90

The relators allege that Allen trained each of them personally and instructed them to "upcode" patient encounters. *Id.* at ¶ 78. Specifically, Allen instructed them to "always bill a Level 3," or mid-level encounter, no matter how straightforward the visit may have been. *Id.* The relators allege that Allen frequently "encountered" patients without entering the

examination room. *Id.* at ¶ 81. They contend that they "saw" such encounters "falsely billed to federal health care programs by Dr. Allen and his staff as Level 3 encounters." *Id.* Richardson claims that approximately 40 patients told him that Allen diagnosed them from the exam room doorway. *Id.* at ¶ 83. The relators allege, "[u]pon information and belief" that these encounters were billed falsely at Allen's typical Level 3 encounter rate. *Id.*

The relators also contend that Allen trained his staff to upcode medical procedures. *Id.* at ¶ 91. For example, with respect to nail care, Allen instructed them to always use the billing code for "six or more toes," regardless of the number of toes actually treated. *Id.* ¶ 95. They also allege that he instructed them to always use the more complex of two codes available for hammertoe surgeries. *Id.* at ¶¶ 109-110.

The relators claim that Allen routinely billed for nail avulsions (an involved procedure, requiring local anesthesia) when he actually performed simple "corner clips." *Id*. at ¶¶ 98-100. Richardson contends that he observed this on 20 to 30 occasions when he saw Allen's patients for follow-up visits after Allen had purportedly performed a nail avulsion. *Id.* at ¶ 100. Richardson examined the patients, expecting to find the "telltale inflammation, missing nail plate, healing wound in the nail bed . . .," but there were "no physical signs whatsoever" of the nail avulsion described in Allen's notes. *Id.* When Richardson questioned the patients about their encounters with Allen, they "routinely responded" by telling Richardson that there was no procedure performed. *Id.* at ¶ 101.

The relators provide two particular allegations regarding upcoding for nail avulsions. They claim that Allen saw "Patient A" in June 2016, and diagnosed a fungal infection of the toenail, atherosclerosis, diabetic neuropathy, and an ingrown nail. *Id.* at ¶ 102. Allen's records indicated that he performed a nail avulsion. *Id.* Patient A followed up with Allen in July 2016,

but the record for that date does not mention the nail avulsion or the "characteristic post-procedure presentation" of the affected toe. *Id.* at ¶ 103. Richardson followed up with Patient A in late August 2016 and inquired about the avulsion procedure. *Id.* at ¶ 104. Patient A "responded to the effect of, 'I don't know what you are talking about. I just come here to get my nails trimmed.'" Richardson saw no physical signs that a nail avulsion had been performed. *Id.* The relators allege, "[u]pon information and belief," Allen submitted or caused to be submitted false claims for reimbursement of a nail avulsion on Patient A that he did not perform. *Id.* ¶ 105.

The relators contend that Allen also performed a nail avulsion on "Patient B" in June 2016. *Id.* at ¶ 106. Allen saw Patient B again in mid-July 2016, but his notes made no mention of the nail avulsion. *Id.* at ¶ 107. Instead, Allen recorded that he debrided Patient B's toenails and two calluses. *Id.* Patient B's medical record does not contain a medical consent form, which the relators allege is always completed before an avulsion. *Id.* at ¶ 106. As with Patient A, the relators allege, upon information and belief, that Allen submitted or caused to be submitted false claims for reimbursement of a nail avulsion that he did not perform. *Id.* at ¶ 108.

The relators also claim that Allen performed medically unnecessary and unreasonable procedures. *Id.* at ¶ 111. Namely, they assert that Allen almost always performed a tarsal tunnel release when he performed an endoscopic plantar fasciotomy. *Id.* They contend that he did so without properly diagnosing patients with tarsal tunnel syndrome and when patients had no symptoms of tarsal tunnel syndrome. *Id.* According to the relators, Allen did it simply so he and Lexington Foot & Ankle could falsely bill for the procedure. *Id.*

The relators allege that Allen also ordered unnecessary and unreasonable tests and durable medical equipment ("DME") and instructed the relators to do the same. *Id.* at ¶ 129. For example, Richardson contends that Allen ordered a "substantial combination" of MRI scans, x-rays, Unna boots, Xerosox, walking boots, surgical shoes, shoe inserts, and night splints as a first line of treatment for minor tendonitis. *Id.* at ¶ 132. Allen instructed and encouraged staff to order diagnostic tests and encouraged the use of higher paying CPT codes for x-rays. *Id.* at ¶¶134-135.

Defendants Allen and Lexington Foot & Ankle own and operate an MRI machine at their Harrodsburg Road clinic in Lexington, Kentucky. *Id.* at ¶ 142. The relators allege that the defendants violated the Stark Law's prohibition on self-referral, 42 U.S.C. § 1395nn, by ordering MRIs and scheduling patients for appointments at Lexington Foot & Ankle Harrodsburg Road clinic. *Id.* They further contend that the defendants' staff placed written confirmation in patient records indicating that third-party MRI services were offered to patients when no such alternative services were actually offered. *Id.* at ¶ 143.

The relators also claim that Allen and Lexington Foot & Ankle impermissibly referred patients to Lexington Diabetic Center. Before Allen or other podiatrists may perform a surgical procedure, the patient must be medically cleared to undergo surgery. *Id.* at ¶ 146. The relators allege that Allen and Lexington Foot & Ankle self-referred all, or nearly all, of their surgical candidates to Lexington Diabetic Center for their pre-operative examinations, in violation of the Stark Law. ¶ 147. According to the relators, "patients are just automatically, without option, scheduled to go to Lexington Diabetic Center, PSC for pre-operative examination. . . ." ¶ 149. In addition, Lexington Diabetic Center owns and operates a device used to administer nerve conduction studies. ¶ 151. The relators assert that the defendants

impermissibly self-referred all, or nearly all of their patients who received nerve conduction studies to Lexington Diabetic Center. *Id.*

The staff of Lexington Foot & Ankle provides podiatric services to residents of approximately 25 nursing homes in Central Kentucky. *Id.* at ¶ 115. However, routine nail and foot care is not covered by Medicare ordinarily. 42 C.F.R. § 411.15. But such care may be reimbursable when systemic conditions cause circulation or sensation deficits such that routine care may pose a hazard if performed by a non-professional.[1] The relators assert that the defendants provided routine nail and foot care to nursing home patients (and billed federal programs accordingly) without regard to whether exceptional circumstances were present. *Id.* at ¶¶ 115, 123. The relators further allege that, once a nursing home patient received foot and nail care, the patient was placed in rotation in which the patient was seen every 61 days (the maximum Medicare will allow) indefinitely. *Id.* at ¶ 121. The relators state that the same scheme occurred on an outpatient basis at Lexington Foot & Ankle Center. *Id.* at ¶ 121.

The relators claim that the defendants frequently utilized nurse practitioners to perform routine foot and nail care of patients in nursing homes. *Id.* at ¶ 125. They further allege that the nurse practitioners were always or almost always sent to perform these procedures alone, which made all billing for these services fraudulent. *Id.* at ¶ 125. The relators also contend that, "upon information and belief," the services provided by nurse practitioners were often billed by Allen and the defendants' staff under podiatrists' provider numbers. *Id.* at ¶ 127.

---

[1] Medicare Benefit Policy Manual, Chapter 15, Covered Medical and Other Health Services. https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c15.pdf (last visited June 4, 2018).

Finally, the relators assert that Allen changed provider numbers in patient records from that of the actual providers to his own number. ¶ 153. For example, the relators contend that, although Allen "made a practice" of not working on Fridays, Patient C's record from Friday, June 3, 2016, was updated to list Allen as the treating podiatrist. ¶ 154. Although Richardson treated Patient C on June 3, 2016, the relators allege that "upon information and belief," the "update" which changed the named provider to Allen caused claims to be submitted for reimbursement as if Allen treated Patient C. *Id.*

According to the relators, this conduct constitutes violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), including knowing presentation of false claims for payment; knowing creation of false records; conspiring to commit a violation of § 3729(a)(1)(A),(B); and violations of the Stark Law, 42 U.S.C. § 1395nn.

## II.

In reviewing the defendants' motion to dismiss, the Court must accept all well-pleaded factual allegations as true and construe the Complaint in the light most favorable to the plaintiffs. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Complaints generally are not required to include detailed facts, but must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, is an anti-fraud statute that prohibits the knowing submission of false or fraudulent claims to the federal government. Section 3729(a)(1) imposes liability when a person:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(C) conspires to commit a violation of [the Act].

Parties alleging violations under the FCA must do so with particularity because the heightened pleading standard imposed under Rule 9(b) of the Federal Rules of Civil Procedure applies to these claims. *United States ex rel. Bledsoe v. Community Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007) ("*Bledsoe II*") (citing *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 562-63 (6th Cir. 2003)). The Sixth Circuit has determined that particularized allegations of a false claim submitted for payment to the federal government—as opposed to a mere false scheme—are required. *Id.* at 504. This demand arises from the plain language of Rule 9(b), which requires that "the circumstances constituting fraud" be pled with particularity. The FCA, in turn, is focused on conduct involving a "false or fraudulent claim." *Id. See also Chesbrough v. VPA, P.C.*, 655 F.3d 461, 472-73 (6th Cir. 2011); *United States ex rel. Kustom Prods., Inc. v. Hupp & Assocs., Inc.*, No. 2: 15-CV-03101, 2017 WL 2021512, *5 (S.D. Ohio May 12, 2017) (false record claim under § 3729(a)(1)(B) also requires particularized allegation of false claim).

To state a claim under the FCA, the plaintiff must sufficiently plead:

> [1] that the defendant made a false statement or created a false record [2] with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information; [3] that the defendant . . . submitted a claim for payment to the federal government; . . . and [4] that the false statement or record was material to the Government's decision to make the payment sought in the defendant's claim.

*United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 408 (6th Cir. 2016) (alterations omitted).

### III.

Rule 9(b) requires a plaintiff to state the "who, what, when, where, and how" of the

alleged fraud. *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006). This requires identification of a representative false claim that was actually submitted to the government. *Chesbrough*, 655 F.3d at 470. *See also United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905 (6th Cir. 2017). Although relators are not required to identify *every* false claim submitted for payment, they "must identify with specificity 'characteristic examples that are illustrative of the class of all claims covered by the fraudulent scheme." *Id.* (quoting *Bledsoe* II, 501 F.3d at 511). The relators concede that they have not pled by date, patient name, or dollar amount any particular false claim that was submitted to the government. [Record No. 20, pp. 1-2] Under ordinary Rule 9(b) and FCA pleading standards, this is fatal to the Complaint. *See Bledsoe II*, 501 F.3d at 504 (citing *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 235 (1st Cir. 2004)).

The plaintiffs encourage the Court to "relax" the requirements of Rule 9(b), as the Sixth Circuit appeared to do for the first time in *United States ex rel. Prather v. Brookdale Senior Living Communities., Inc.*, 838 F.3d 750 (6th Cir. 2016). There, the relator (a home-health utilization review manager) was not required provide a specific false claim that was submitted to the government because she had "allege[d] specific personal knowledge that relate[d] directly to billing practices," that supported a "strong inference that a [false] claim was submitted." *Id.* at 768-69.

The year after *Prather* was decided, the Sixth Circuit clarified that courts have no authority "relax" or otherwise modify the Rules of Civil Procedure, including the pleading standard set out in Rule 9(b). *See United States ex rel. Hirt v. Walgreen Co.*, 846 F.3d 879, 881 (6th Cir. 2017). Accordingly, the standard applied in *Prather* is simply an alternative means of meeting Rule 9(b)'s particularity requirement, and it applies in limited

circumstances. *See id*. at 881-82. Prior to the decision in *Prather*, the Sixth Circuit indirectly approved of other courts' application of the alternative rule, but only where the relators were former employees directly involved in billing. *See United States ex rel. Hirt v. Walgreen Co.*, 846 F.3d 879, 881 (6th Cir. 2017); *Bledsoe II*, 501 F.3d at 504 n. 12. (citing *Hill v. Morehouse Medical Associates, Inc.*,, No. 02-14429, 2003 WL 22019936 (11th Cir. Aug. 15, 2003) (relator was former coder/biller for defendant hospital)); *Chesbrough*, 655 F.3d at 471 (citing *United States ex rel. Lane v. Murfreesboro Dermatology Clinic, PLC*, 2010 WL 1926131 (E.D. Tenn. May 12, 2010) (relator was defendant's former billing specialist with specialized knowledge of defendant's billing practices)).

As indicated previously, the relators contend that the defendants engaged in widespread fraud that was composed of various schemes, which differ considerably in terms of the conduct alleged. Courts are cautioned to construe false or fraudulent schemes as narrowly as necessary to protect the interests promoted by Rule 9(b). *Bledsoe II*, 501 F.3d at 510 (citing *United States ex rel. Joshi v. St. Luke's Hosp. Inc.*, 441 F.3d 552, 557 (8th Cir. 2006)). The Court has examined the specific allegations relevant to each individual scheme and finds that the relators have not provided sufficient facts to conclude that any actual false claims in "all likelihood exist." *Hirt*, 846 F.3d at 882 (quotation marks and citation omitted).

The alleged fraud can be divided into six broad schemes: unnecessary procedures and DME; self-referrals in violation of the Stark Law; non-covered routine foot and nail care; inappropriate utilization of nurse practitioners; alteration of provider numbers; and upcoding encounters and procedures. The vast majority of the allegations plainly do not include any information from which the Court could conclude that the relators possess personal knowledge

regarding the actual submission of fraudulent claims to government payers.[2] Unlike the relators that have successfully pursued FCA claims without providing specific examples of false claims submitted to the government, neither Richardson nor Brooks worked in the defendants' billing or claims department.

While the relators contend that Allen "micromanaged" the billing at Lexington Foot & Ankle, there is no suggestion that Allen maintained exclusive possession of billing information. [Record No. 1, ¶¶ 66, 68] In fact, the relators allege that the defendants' staff (who the relators have failed to identify) were "indoctrinated in Allen's system of false billing." *Id.* ¶ 66. Certainly the relators, as health care providers, were involved in submitting charges for the services they provided, so it is unclear why they failed to provide any specific information regarding the defendants' billing practices. Regardless, they have not given any facts regarding the defendants' claim submission or billing process, which suggests that they do not have personal knowledge regarding claims (fraudulent or otherwise) that were submitted to the government for payment.

The relators' failure to *attempt* to identify particular claims with specificity is curious. It is clear that this showing ordinarily is required to withstand a motion to dismiss under Rule 12(b)(6). *See Hirt*, 846 F.3d at 881. And while the relators allege that Allen's fraud was rampant (*i.e.,* he frequently upcoded hammertoe surgeries; he always upcoded patient

---

[2] The relators do not allege that the defendants submitted any particular claim to or received any particular payment from a federal program. The Complaint describes various federal programs, including Medicare and Medicaid, and states "Defendants received payment under the federal and state workers compensation programs, as well as other programs alleged herein." In their response to the Motion to Dismiss, the relators specify that Patients A and B were covered by Medicare during the relevant period. The relators seek leave to amend the Complaint, if necessary. [Record No. 20, p. 7 n.2]

encounters; he almost always self-referred MRIs, etc.), they were unable to identify a single patient involved in this activity. The relators only stopped working for the defendants in September 2016 and the Complaint was filed in March 2017. Even if the relators were unable provide the complete "who, what, when, where, and how," some of it is better than none. It is understandable that a former billing clerk, who presumably had little or no patient interaction was not able to recall a specific patient or claim. *See Hill*, 2003 WL 22019936. But it less understandable that a podiatrist who worked in the practice for four years, and treated the defendant's patients regularly, is unable to do so.

The relators rely heavily on allegations regarding Allen's use of templates, which included "key phrases" used to obtain reimbursement. However, without a specific example of a fraudulent claim, the allegations are of limited persuasive value. Pre-populated forms, from which providers choose applicable symptoms and diagnoses, are not uncommon in medical practice. Without a concrete example of how the form was misused, there is no strong indication that a fraudulent claim was submitted for payment.

The same is true with respect to the allegations concerning routine foot and nail care. Despite the relators' allegation that they have "seen a steady pattern of false claims" being submitted for reimbursement, there are insufficient facts to satisfy the heightened pleading standard that applies under Rule 9(b). Essentially, the relators claim that they have never seen Allen or any of defendants' staff taking steps to ensure that foot and nail care is medically necessary. [Record No. 1, ¶ 119] They further claim that the defendants "plott[ed] out sixty-one-day increments" to maximize the frequency and amount of foot care reimbursements." *Id.* at ¶ 122. The relators' bare allegation that they failed to observe something is not particularly strong evidence that it did not happen. And without more, the allegations concerning

treatments every 61-days does not indicate that the defendants submitted fraudulent claims. Again, the relators have not provided sufficient facts to conclude that false claims actually exist.

The relators' claims concerning nurse practitioners fare no better. *Id.* at ¶ ¶ 125-27. They have provided no information whatsoever to suggest that they have first-hand knowledge regarding any false claims for work done by nurse practitioners. Not only did the relators fail to provide a specific example of a fraudulent claim, they failed to allege that they personally observed nurse practitioners performing patient care. Further, the relators failed to provide any factual basis for their allegation that nurse practitioner services were being billed by the defendants and their staff under podiatrists' provider numbers. Although courts have permitted allegations of fraud based on "information and belief," the complaint must "set forth a factual basis for such belief." *Sanderson*, 447 F.3d at 878. The relators have failed to do so here.

The remaining allegations require additional discussion because the relators have provided a bit more factual support with respect to those alleged schemes. The relators claim that Allen submitted a false claim for reimbursement for a nail avulsion on Patient A that he never performed. [Record No. 1, ¶ 5] Although the relators did not allege it in the Complaint, they now contend that Patient A was "covered by Medicare." Admittedly, this claim comes closer to satisfying the requirements of Rule 9(b), but it still does not quite get there.

The relators have provided much of the relevant information—"who," (Dr. Allen and Patient A), "what," (billing for a nail avulsion when he actually performed a lesser procedure), and where (June 2016). However, a crucial allegation is missing. The relators have not provided any information regarding the actual submission of a claim for the alleged upcoded procedure. There is no indication that the relators reviewed an actual bill or invoice or spoke

- 13 -

with any employee directly responsible for submitting the alleged claim. *See Prather*, 838 F.3d at 769. And although the relators now claim that Patient A was "covered by Medicare," there is no suggestion that this particular claim was submitted to Medicare.

The relators' claim regarding Patient B is more flimsy. They contend that Allen documented having performed a nail avulsion on Patient B in June 2016. [Record No. 1, ¶ 106] However, Allen only told Patient B to follow-up as needed. *Id.* Allen saw Patient B again in mid-July 2017 and the treatment note for that visit did not mention the nail avulsion. *Id.* at ¶ 107. Further, Patient B's record did not contain a medical procedure consent form, which is "always" completed before a nail avulsion. *Id.* ¶ 106. Based on these allegations, the relators assume that Allen billed for a nail avulsion he never performed. *Id.* at ¶ 108. But without a direct statement from the patient, as in the case of Patient A, it is equally likely that Allen's documentation left something to be desired. Regardless, the claim involving Patient B fails for the same reason as the claim involving Patient A.

Finally, the relators claim that Allen altered records by changing provider numbers from those of the actual providers to his own number. *Id.* at ¶ 153. They contend that, in doing so, Allen defrauded federal payers and the defendants' employees, who were payed based on their productivity. *Id.* The relators provide the following example: Richardson treated Patient C on June 3, 2016, as reflected in his note by the initials "JR." *Id.* at ¶ 154. Allen updated the note, although he was not present in the clinic on June 3, 2016. *Id.* Allen was listed as the treating podiatrist, based on his updated note. *Id.* The relators contend, "based upon information and belief," that this caused claims for reimbursement for Patient C's care to be submitted as if Allen had treated Patient C.

Allegations made on "information and belief" must be based on facts as the Court has explained previously. The relators have not provided any factual basis, such as their personal observations, or conversations with the defendants' billing specialist, to support the notion that Patient C's care was billed as if Allen provided it. Further, there is no indication that Patient C's claims were presented to a federal program. Accordingly, this claim, along with the others, must be dismissed.

### IV.

District courts generally must give plaintiffs "at least one chance to amend the complaint" before dismissing it with prejudice. *United States ex rel. Bledsoe v. Community Health Sys., Inc.*, 342 F.3d 634, 644 (6th Cir. 2003) (*Bledsoe I*); *United States ex rel. Armes v. Garman*, 719 F. App'x 459, 465 (6th Cir. 2017). The relators have requested "leave to amend their Complaint" but have not attached a proposed amended complaint. Instead, they have advised the Court regarding their proposed amendments to a new complaint should this matter be dismissed without prejudice. [Record No. 20, p. 11] To the extent these may shed light on the topics addressed herein, the Court cannot say that amendment of the Complaint would be futile. *See id.* Accordingly, dismissal without prejudice is appropriate.

### V.

Based on the foregoing, it is hereby

**ORDERED** as follows:

1. The defendants' motion to dismiss [Record No. 15] is **GRANTED**. The Complaint [Record No. 1] is **DISMISSED**, without prejudice.

2. The United States' motion to partially intervene [Record No. 17] is **DENIED**, as moot.

3. The motion hearing, previously scheduled for June 8, 2018, is **CANCELED**.

4. This matter is **STRICKEN** from the Court's docket.

This 5th day of June, 2018.

Signed By:
*Danny C. Reeves* DCR
United States District Judge